UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 06-CV-198-KKC

DORIAN COTLEDGE                                                                                    PLAINTIFF

VS:                          **MEMORANDUM OPINION AND ORDER**

UNITED STATES OF AMERICA                                                                  DEFENDANT

Currently before the Court for consideration are the following pleadings:

(1)    The "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" [Record No. 23], filed by the defendant, the United States of America;

(2)    the "Response" [Record No. 28] filed by Dorian Cotledge, the *pro se* plaintiff, to the United States' Motion.

FACTUAL BACKGROUND

1. The Complaint

The plaintiff was previously confined in the Federal Correctional Institution in Manchester, Kentucky ("FCI-Manchester").[1]  On May 8, 2006, he filed a *pro se* civil rights complaint [Record No. 1] in which he asserted claims of negligence under the Federal Tort Claims Act ("FTCA"), Title 28 U.S.C. §§1346(b), 2671-2680.[2]  The United States of America is the sole defendant.

He alleged that while confined there, employees (specifically, Physician's Assistant ("PA") Van Horn) committed various acts of medical negligence over a several-month period.  He claims

---

[1] On January 26, 2007, the plaintiff filed a Notice of Change of Address [Record No. 30].  Plaintiff informed the Court that he is currently confined in the United States Penitentiary in Leavenworth, Kansas.

[2] The plaintiff filed an Amended Complaint on May 15, 2006 [Record No. 3].  In his Amended Complaint, he essentially reiterated the same FTCA claims which he had raised in his original complaint.

that PA Van Horn failed to properly diagnose his medical conditions; failed to properly administer diabetes tests; failed to treat his various medical conditions; and prescribed improper medications, all of which caused him to sustain additional physical problems.

The plaintiff alleged that the improper diagnoses for diabetes, high blood pressure, and an enlarged prostate resulted in his receiving medications which caused him to sustain additional physical problems, including stomach distress, breathing problems, and limited ability to perform physical activities. He claims that the United States' negligence has subjected him to serious bodily harm. The plaintiff seeks $1,500,000.00 in monetary damages.

1. Motions for Summary Judgment [Record Nos. 14 and 17]

In the Motion, the United States argues that the FCI-Manchester medical staff properly treated the plaintiff's symptoms and that the treatment fell within the acceptable standard of care. As such, the United States contends that none of the elements of a *prima facie* case of medical negligence exist. The United States argues that because the diagnoses for diabetes and other related conditions were reasonable and did not deviate from the medical standard of care, dismissal is warranted.

In support of its Motion, the United States has attached the Declaration of Luis Cordero, M.D., who is the Clinical Director at FCI-Manchester [Record No. 23-4, pp. 1-6]. The United States has also submitted numerous medical records of the plaintiff which supplement Dr. Cordero's Declaration [*Id.*, pp 7-35].[3]

---

[3] The Court had difficulty reading various handwritten notes prepared by FCI-Manchester medical staff and therefore directed the United States to submit typewritten transcriptions of certain entries. The United States filed the typewritten entries on February 27, 2007 [*See* Record No. 33-3, pp. 1-19].

A. <u>Diabetes Mellitus Diagnosis</u>

In his Declaration, Dr. Cordero states that on January 14, 2005, he diagnosed the plaintiff with a pre-diabetes condition, hyperglycemia, based on an increased glucose level of 123 (normal range 74-109), and weight gain. [Record No. 23-3, ¶2]  He diagnosed the plaintiff as having Metabolic Syndrome.[4]  Cordero stated that consideration of the plaintiff's risk for heart attack and stroke justified an aggressive treatment of Metabolic Syndrome.

Dr. Cordero states that on April 13, 2005, blood work done on Plaintiff revealed an elevated glucose level.  On June 8, 2005, FCI-Manchester Physician's Assistant PA Van Horn, who is a certified PA and a commissioned officer in the United States Public Health Service, diagnosed Plaintiff with Diabetes Mellitus (non-insulin dependent diabetes II).  This diagnosis was based on the results of the blood work.

Dr. Cordero asserts that PA Van Horn followed medical guidelines and prescribed Plaintiff medications to address all of his Metabolic Syndrome risk factors, including the Diabetes Mellitus which the blood tests indicated.  Dr. Cordero's opinion is that PA Van Horn's decision was reasonable and correct given the objective medical information available at the time, such as blood sugar level test results, blood pressure readings, and his weight.

On August 29, 2005, Plaintiff's blood sugar was noted as having fallen to 89.  After further evaluation, Plaintiff was subsequently taken off the medication and treatment plan for Diabetes Mellitus. His blood sugar at that time was stable and the plaintiff was told that he should continue to watch his diet and exercise.  Dr. Cordero stated that it was determined that the plaintiff did not

---

[4] Dr. Cordero explains that the existence of three or more of the risk factors of hyperglycemia, obesity, hypertension, and hyperlipidemia result in a diagnosis of Metabolic Syndrome.  According to Dr. Cordero, when a patient suffers from Metabolic Syndrome, he is at a three-fold risk for heart attack to occur. [Cordero Decl., ¶ 2].

have Diabetes Mellitus, although he continued to have a diagnosis for hyperglycemia and all the other risk factors of Metabolic Syndrome. Dr. Cordero stated that the plaintiff clearly had a pre-diabetic condition which required aggressive treatment.

Medical staff noted that the plaintiff continued to have related problems with obesity and continued weight gain. According to Dr. Cordero, although Plaintiff was prescribed the Heart Healthy diet option after his diabetes diagnosis, he had been documented as refusing this healthy meal option and choosing to eat the regular fare.

Dr. Cordero states that it is uncertain whether Plaintiff fasted before the April 13, 2005 blood work was done. He concludes that PA Van Horn would not have known whether Plaintiff did or not, and Van Horn properly diagnosed and treated Plaintiff based on the objective results of the blood work, medical history, family medical history, and subjective complaints. Dr. Cordero concluded that PA Van Horn's treatment plan was especially proper because of the necessity to aggressively treat the risk factors associated with Plaintiff's Metabolic Syndrome.

B. <u>Hypertension Diagnosis</u>

According to Dr. Cordero's statement, the hypertension diagnosis was proper, given the plaintiff's high blood pressure readings. Dr. Cordero states that the plaintiff clearly suffered from hypertension and was on medications for hypertension while he was at FCI-Manchester.

Dr. Cordero states that the plaintiff's blood pressure readings throughout 2005, even while medicated, showed he had borderline hypertension readings. Dr. Cordero explains that, given the fact the plaintiff suffered from Metabolic Syndrome, the plaintiff's hypertension and other risk factors needed to be treated aggressively.

Dr. Cordero disputes that the drug Doxazosin was given to Plaintiff to treat an enlarged

4

prostate; it was administered to treat hypertension and frequent urination. Dr. Cordero states that this drug is used to treat hypertension and benign prostate hypertrophy, although in Plaintiff's case the drug was used to treat only his hypertension. Later, this drug was discontinued and the plaintiff's hypertension was treated with Lisinopril.

### C. Stomach Conditions

Dr. Cordero states that during the time period relevant to this complaint, the plaintiff suffered from gastroesophageal reflux disease (GERD) and an *H. Pylori* infection of the stomach. Dr. Cordero explains that these disorders can cause acid reflux, heartburn, epigastric pain, bloating, and abdominal discomfort, which are the symptoms of which Plaintiff complained. Dr. Cordero states that the plaintiff was treated for the *H. Pylori* infection, but he refused treatment for the GERD.

Dr. Cordero states that in his medical opinion, the GERD and *H. Pylori* infection caused the discomfort and symptoms of which he complained, not the medications he was prescribed for diabetes, hypertension, and other related medical problems. Dr. Cordero opines that there is no evidence any of these medications or treatments have caused Plaintiff any physical problems or limited his ability to do normal physical activities. Dr. Cordero states that on the contrary, the plaintiff's records indicate he has functioned normally throughout the time period relevant to this complaint and the time period subsequent to this time period.

### 2. Plaintiff's Response [Record No. 28]

The plaintiff submitted a handwritten response to the United States' response. In his response, he reiterates his claim that the prison's medical staff did not commit medical negligence. He states that the PA negligently diagnosed him as suffering from diabetes, high blood pressure, and

5

an enlarged prostate. In large part, the plaintiff bases his claims on the fact that he (plaintiff) had not been told to fast prior to the initial April 13, 2005 blood test.

Plaintiff strenuously argues that in light of that fact, he was improperly prescribed medications. As he did in his complaint, Plaintiff also alleges that the diagnoses of high blood pressure and enlarged prostate were erroneous.

## STANDARD OF REVIEW

The defendants have filed motions for summary judgment under Fed. R. Civ. P. 56. Under that rule, summary judgment is appropriate "if ... there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986) (citation omitted).

Under Fed. R. Civ. P. 56(e), "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." In considering a summary judgment motion, "the evidence as well as the inferences drawn therefrom must be read

6

in the light most favorable to the party opposing the motion." *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348 (1986) (same).

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *see also Id.* at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. ").

The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

With these considerations in mind, the Court will address the various arguments presented by the defendants and the plaintiff's responses thereto.

## DISCUSSION
### 1. FTCA Legal Standards

Under the FTCA, a plaintiff may recover monetary awards from the United States for injury, property loss, or death "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope .. . of employment." [28 U.S.C. §1346(b)] The FTCA directs federal courts to look to "the law of the place where the act or omission occurred," 28 U.S.C. §1346(b)(1).

The United States may be held liable *only* if the conduct complained of amounts to

7

negligence "in accordance with the law of the place where the act or omission occurred." *Rayonier, Inc. v. United States*, 352 U.S. 315 (1957). In an FTCA action, this Court must apply the law of the state where the alleged negligent acts occurred, thus making Kentucky state tort law applicable to Plaintiff Cotledge's claims. *Rayonier*; *Flechsig v. United States*, 991 F.2d 300, 303 (6 Cir. 1993); 28 U.S.C. §1346(b)(1) ("liable to the claimant in accordance with the law of the place where the act or omission occurred").

For a plaintiff to maintain an FTCA action for negligence against the United States, he must establish the common law elements of negligence; namely, that the BOP medical staff had a duty to perform, that they failed to perform the duty, and that as a direct result of the failure Plaintiff was harmed. In essence, the plaintiff must demonstrate "causation." *See Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky.1992); *Rich For Rich v. Kentucky, Country Day, Inc.*, 793 S. W. 2d 832, 834 (Ky. App. 1990); and *M&T Chemicals v. Westrick*, 525 S. W. 2d 740 (Ky. 1974).

Another requirement must be satisfied in order to assert a medical malpractice action under the FTCA. First, a plaintiff must show the challenged treatment was a deviation below the applicable standard of care required and expected of a reasonably competent practitioner. *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky.1982); *Blair v. Eblen*, 461 S.W.2d 370, 373 (Ky.1970). Second, a plaintiff must show that the alleged negligent act proximately caused the claimed injury. *Reams v. Stutler*, 642 S.W.2d at 588; *Williams v. Tarter*, 151S.W.2d 783 (Ky. App. 1941).

Kentucky employs the "substantial factor" test in matters of causation and proximate cause. *Melvin Deutsch v. Shein*, 597 S.W.2d 141 (Ky. 1980).[5] Generally, expert testimony is required to

---

[5] In *Deutsch*, the court, citing *Restatement of Torts, Second*, §431, further defined "substantial cause" as follows:

8

show that a medical provider failed to conform to the applicable standard of care and caused the plaintiff's injury. *See Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996); *Jarboe v. Harting*, 397 S.W.2d 775, 777-78 (Ky.1965).

### 2. Application of Law to Facts
### A. Diabetes Mellitus Diagnosis

The plaintiff alleges that PA Van Horn negligently failed to inquire or determine if he (plaintiff) had fasted on April 13, 2005, just prior to administering the diabetes test. Plaintiff asserts that because he had not fasted, the blood test result erroneously indicated that he suffered from Diabetes Mellitus. He alleges that based on an erroneous diagnosis, FCI-Manchester then prescribed various medications to treat a condition from which he did not suffer, to his detriment.

The first question before the Court is whether the Diabetes Mellitus diagnosis and resulting treatment by FCI-Manchester medical staff constituted a deviation below the applicable standard of care required and expected of a reasonably competent practitioner. If the answer to that question is yes, then there is a second consideration. That is, whether the negligent act (mis-diagnosis) proximately caused the claimed injury. *Reams v. Stutler*, 642 S.W.2d at 588.

In an effort to answer the first question, the Court has carefully reviewed the medical documentation from 2005 which the United States submitted as attachments to Dr. Cordero's

---

. . . In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. (T)his is necessary, but is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm. The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause. . . .

*Id*. at 144.

Declaration. On review of the substantial medical evidence, the Court concludes that the medical staff at FCI-Manchester did not commit actionable medical malpractice by diagnosing the plaintiff as suffering from Diabetes Mellitus.

The medical records show the diagnosis for Diabetes Mellitus was reasonable, notwithstanding the possibility claim that PA Van Horn may have failed to determine if the plaintiff had fasted prior to administering a blood test on April 13, 2005. The collective medical information, including but not limited to results from blood-work tests, support the conclusion that the plaintiff suffered from numerous symptoms associated with a diabetic condition. The medical notes from January 14, 2005, reflect that the plaintiff suffered from hyperglycemia and Metabolic Syndrome. His glucose reading on that date was 123. According to Dr. Cordero, the normal range for glucose is 74-79. Plaintiff was instructed to follow an exercise program and to lose weight. The next relevant medical entry is dated April 1, 2005, at which time the plaintiff's elevated blood glucose levels were again noted.

On April 13, 2005, PA Van Horn administered the blood glucose test about which the plaintiff now complains. While PA Van Horn's notes do not indicate whether PA Van Horn asked the plaintiff if he had fasted on that date, the medical notes reflect that the plaintiff was severely overweight and had been gaining weight. He suffered from Metabolic Syndrome, as well as a myriad of other conditions: hypertension, hyperlipidemia; obesity; family history of diabetes; a history of epileptic seizures; and tuberculosis. According to Dr. Cordero, medical staff also noted a family history of diabetes.

On June 8, 2005, the plaintiff's blood glucose level was 139. Based upon that very high

reading, Dr. Cordero contends that the plaintiff was properly prescribed Metformin on that date.[6] On August 2, 2005, the Metformin dosage was decreased; on August 25, 2005, it was discontinued.[7]

The Court is persuaded by Dr Cordero's assessment that the existence of all of the other relevant medical factors, and the results of all of the plaintiff's objective medical tests throughout 2005 (blood glucose, triglycerides, high density lipids), logically pointed to a diagnosis for Diabetes Mellitus. This finding is reinforced by the fact that when the plaintiff was later re-diagnosed and taken off the diabetes treatment plan, he had to continue his treatment for hyperglycemia and other pre-diabetic Metabolic Syndrome problems.[8]

Based upon the abundance of medical records which document this particular plaintiff's propensity to suffer from pre-diabetic symptoms, the Court is convinced that the Diabetes Mellitus diagnosis of June 8, 2005 was not a deviation below the applicable standard of care required and expected of a reasonably competent practitioner. *Reams v. Stutler*, 642 S.W.2d at 588 and *Williams v. Tarter*, 151S.W.2d 783.

---

[6] Of relevance is the fact that on January 14, 2005, the plaintiff's weight was 278 pounds. On April 1, 2005, his weight had increased to 288 pounds. His weight was still at 288 pounds on June 8, 2005, and on July 7, 2005. On July 15, 2005, his weight was 289 pounds. On August 2, 2005, it had increased to 290 pounds Clearly, the plaintiff had difficulty keeping his weight under control. For that reason, PA Van Horn suggested that the plaintiff begin eating "Heart Healthy Meals."

[7] Dr. Cordero states in his Declaration that the Metformin was discontinued on November 21, 2005, but the notes clearly indicate that the drug was in fact discontinued on August 25, 2005 [See Notes from 8/25/05, Record No. 33-3, p. 17].

[8] The medical records further reflect that the plaintiff first threatened to sue if he did not begin receiving "Heart Healthy" diet meals being offered by the prison [*see* Medical Reports of 6/8/05, Record No. 33-3, p. 6]. Soon after receiving the special fare, he complained about the "Heart Healthy" diet meals, claiming that the meals should not have included a potato serving [*see* Medical Reports of 6/24/05, Record No. 33-3, p. 9]. It further appears that for some period of time, the plaintiff unilaterally decided to stop eating the "Healthy Heart" diet meals *in toto* rather than simply abstain from eating the potato portion of the meal [*see* Medical Reports of 7/26/05, Record No. 33-3, p. 9]. The notes reflect that the plaintiff temporarily ended his hunger strike on July 26, 2005 [*Id*.]. Subsequent entries reveal that on October 4, 2005, he signed a form in which he again refused to partake of "Healthy Heart" diet meals [*see Id*., p. 19].

Plaintiff Cotledge has failed to demonstrate that BOP officials breached any duty of care owed him and that any resulting injuries from the diagnosis of Diabetes Mellitus were caused by such breach. *See Mullins*, 839 S.W.2d at 247. Cotledge's bare allegations of medical malpractice was insufficient to permit a layman with general knowledge to recognize medical malpractice regarding the Diabetes Mellitus diagnosis.

Cotledge has not provided any expert opinion to support his medical malpractice claim. *See Vance*, 90 F.3d at 1148; *Jarboe*, 397 S.W.2d at 777-78; and *Matthews v. Robinson*, 52 Fed. Appx. 808, *810, 2002 WL 31809201 (6th Cir. (Ky.) December 12, 2002) (Not selected for publication in the Federal Reporter) (dismissal of FTCA medical malpractice case affirmed where evidence was insufficient in the absence of expert evidence to show that medical provider failed to conform to applicable standard of care and caused inmate's injury).

As the Court has determined that the challenged treatment did not fall beneath the standard of care required and expected of a reasonable practitioner, its is not necessary to determine if the complained-of diagnosis proximately caused any harm. However, assuming for the moment that the diagnosis might have been initially erroneous, the Court cannot conclude that the diagnosis of Diabetes Mellitus was a substantial factor in causing any harm about which the plaintiff now complains. *Deutsch v. Shein*, 597 S.W.2d at 144.

The records reflect that the plaintiff's consumption of the Metformin drug may have actually improved his health by causing the documented decrease in his glucose levels. As noted, on January 14, 2005, the plaintiff's glucose level had been 123. This was three months before the blood glucose test conducted on April 13, 2005. After taking the Metformin for a period of time, the plaintiff's glucose levels decreased to 89 on August 25, 2005.

In sum, the plaintiff has failed to prove the elements of a *prima facie* case of medical negligence under Kentucky law. Under Fed. R. Civ. P. 56 and *Celotex*, there is no genuine issue of material fact on the issue of medical malpractice regarding the diagnosis of Diabetes Mellitus. Summary judgment is warranted and will be granted on this claim.

### B. Hypertension Diagnosis

The Court must agree with Dr. Cordero's conclusion that the hypertension diagnosis was proper, given the plaintiff's high blood pressure readings.[9] Dr. Cordero disputes that the drug Doxazosin was given to Plaintiff to treat an enlarged prostate. He asserts that the drug was administered to treat hypertension and frequent urination. He notes that the drug was later discontinued and that the plaintiff was then treated with Lisinopril.

The Court must again agree that the medical records support Dr. Cordero's conclusions. FCI-Manchester medical staff's treatment of the plaintiff's hypertension condition did not fall beneath the standard of care required and expected of a reasonable practitioner, given the plaintiff's weight control problems and his long-standing blood pressure condition. *Reams v. Stutler*, 642 S.W.2d at 588.

Cotledge's unsubstantiated allegation that the prison staff committed medical malpractice regarding the diagnosis of hypertension is insufficient to permit a layman with general knowledge to recognize medical malpractice against the prison medical staff  *See Vance*, 90 F.3d at 1148; *Jarboe*, 397 S.W.2d at 777-78. The plaintiff has failed to establish a genuine issue of material fact in support of his allegation that medical staff did not properly treat his condition. The defendant has

---

[9] On April 1, 2005, the plaintiff's blood pressure reading was 110/80. On April 13, 2005, his reading had increased to 120/92. On June 8, 2005, it had increased to 140/86 with medications. The reading remained near that range until August 2, 2005, when it was 130/90.

carried its burden on this issue under Fed. R. Civ. P. 56 and *Celotex*.

### C. Stomach and Reflux Conditions

The United States attributes the plaintiff's stomach problems to the fact that he suffered from GERD and *H. Pylori* stomach infection. The United States argues that these two conditions caused the type of symptoms about which the plaintiff complained: acid reflux, heartburn, bloating, and abdominal discomfort [Cordero Decl., ¶ 10]. Dr. Cordero states that while the plaintiff was treated for *H. Pylori* infection, he refused treatment for the GERD [*Id*.].

The plaintiff denies that he suffers from GERD and *H. Pylori* [Record No. 28, p. 6]. He contends that these two conditions could not have caused his stomach pains. He blames his abdominal discomfort on the medications which staff prescribed for his other medical conditions.

While the plaintiff may now contend that he did not believe that he suffered from the GERD and the *H. Pylori* conditions, the medical records from 2005 dispute both claims. The Clinical Laboratory test results reveal that the plaintiff tested positive for *H. Pylori* on October 26, 2005 [Record No. 23-4, pp. 14-15]. Clearly, the plaintiff had an *H. Pylori* infection.

The notes from July 15, 2005, reveal that the plaintiff complained of stomach pain; in fact, the notes emphasize that "[the plaintiff] states the worst of all is the stomach pain." [Record No. 33-3, p. 12] Additionally, the staff noted that the plaintiff admitted to lying down just after he eats his meal [*Id*]. The staff had to explain to the plaintiff that he should not lie down for at least 1-2 hours after eating, and that he needed to lose weight [*Id*]. This recommendation was given to alleviate the adverse GERD symptoms caused by lying down too soon after eating.

The notes from September 21, 2005, reflect that the plaintiff was diagnosed with GERD [Record No. 23-4, p. 12]. On that date, the plaintiff rejected the use of antacids or H2-Blockers

which the medical staff had recommended for treatment of the condition [*Id.*].[10]

The notes from October 3, 2005, October 4, 2005, and October 14, 2005, refute the plaintiff's contention that he had not complained of stomach problems. On October 3, 2005, PA Van Horn noted that the plaintiff complained of "shortness of breath" and "abdominal pain" [*Id.*, p. 3]. PA Van Horn's notes from October 4, 2005, note the plaintiff's complaints about his reflux condition. The notes state: "Told that he [plaintiff] admitted yesterday that he had sour tasting reflux, & that Zantac was the medication of choice. Still refuses." [*Id.*, p. 19]  The plaintiff refused to take Zantac prescribed for the reflux problem [*Id.*].

On October 14, 2005, the plaintiff requested to be evaluated by an outside doctor for his AB (abdominal) pain [*Id.*, p. 1]. In response, the plaintiff was told that his provider could not be changed and that he was to take Zantac for his pain. *Id.*

The record further reveals that the plaintiff had a documented history of making unilateral decisions about which medications he would take. In addition to his frequent rejection of the "Healthy Heart" diet meals (as discussed previously), the plaintiff also informed the medical staff at FCI-Manchester on August 2, 2005, that he had not taken his prescribed Dilantin medication (used to treat epilepsy) in three weeks "because he feels he's taking too much medication." [Record No. 33-3, p. 14] The medical staff noted that on that date, they had to "educate on importance of taking his Dilantin as prescribed." [*Id.*][11]  The medical notes further reveal that on October 4, 2005, the

---

[10] The term "H2-Blocker" is used to refer to receptor-antagonist drugs. These drugs block the action of histamine on parietal cells in the stomach. Explained in more understandable terms, they decrease acid-secreting cells in the stomach. *See Wikpedia, the Free Encyclopedia.* Examples of an H2-Blockers are Tagamet; Ranitidine (Zantac); and Famotidine (Pepcid).

[11] This was the second time the staff noted that the plaintiff had unilaterally stopped taking his Dilantin. On June 8, 2005, the staff noted that the plaintiff stated that he had not taken his Dilantin for a week [*Id.*, p. 6].

plaintiff refused to take Zantac to treat his complaints of "sour-tasting" reflux [*Id*., p. 19]. Medical staff asked the plaintiff sign a Refusal Form [*Id*.].

Clearly, the plaintiff, who has no training in medicine, has substituted his own judgment in place of that of the trained medical staff at FCI-Manchester on various occasions. Dr. Cordero concludes that it was the GERD and *H. Pylori* conditions which caused the plaintiff to experience stomach pains, not the use of medications prescribed to treat his other many medical conditions. Once again, on the issue of the treatment of the GERD and H. Pylori conditions, Cotledge's bare allegations of medical malpractice are insufficient to permit a layman with general knowledge to recognize medical malpractice against the prison medical staff. *See Vance*, 90 F.3d at 1148; *Jarboe*, 397 S.W.2d at 777-78.

Despite filing extensive pleadings which are amazingly detailed for a *pro se* filing, the plaintiff simply does not raise a genuine issue of fact regarding the *H. Pylori* and GERD claim. "Negligence, under Kentucky law, requires a showing of duty, breach of duty, and resulting injury." *Smith v. Franklin County*, 227 F. Supp.2d 667, 682 (E.D. Ky. 2002). On the claim that the medical staff improperly diagnosed the plaintiff as having GERD and *H. Pylori*, and/or his claim that these conditions did *not* cause him to suffer abdominal pains, the plaintiff has not established a breach of duty on the part of the prison medical staff.

The plaintiff's allegations on this topic simply are not convincing in light of the medical entries and Dr. Cordero's reasoned assessment. Based on the law which establishes the criteria for medical malpractice, *Reams v. Stutler*, 642 S.W.2d 586; *Williams v. Tarter*, 151 S.W.2d 783; and *Deutsch v. Shein*, 597 S.W.2d 141, the plaintiff has failed to create a genuine issue of fact on the issues relating to the side effects of the *H. Pylori* and GERD conditions.

CONCLUSION

Accordingly, the Court being duly and sufficiently advised, **IT IS ORDERED** as follows:

(1) The "Motion to Dismiss or in the Alternative, Motion for Summary Judgment" filed by the United States of America [Record No. 23] is **GRANTED**.

(2) This action is **DISMISSED WITH PREJUDICE** and Judgment shall be entered contemporaneously with this Memorandum Opinion and Order in favor of the United States of America.

Dated this 9th day of April, 2007.

Signed By:
*Karen K. Caldwell*  KKC
United States District Judge